1　　　　　　　　　UNITED STATES DISTRICT COURT
2　　　　　　　　　　DISTRICT OF PUERTO RICO
3
4

ASLIN M. GABRIEL-YAMBO,

　　　Plaintiff,　　　　　　　　　　　　Civil No. 3:14-CV-01641 (JAF)

　　　v.

CENTRO MÉDICO DEL TURABO, INC.,
doing business as Hospital HIMA-San Pablo
de Caguas,

　　　Defendant.

5
6　　　　　　　　　　　**OPINION AND ORDER**

7　　　　　　　　　　　　　　**I.**

8　　　　　　　　　　　　**Introduction**

9　　　　On August 22, 2014, plaintiff Aslin M. Gabriel-Yambó ("Gabriel") commenced

10　　this action against her employer, defendant Centro Médico del Turabo, Inc. ("Centro

11　　Médico"), by filing a complaint alleging discrimination and retaliation claims under the

12　　Americans with Disabilities Act ("the ADA"), 42 U.S.C. § 12101 *et seq*., the Puerto Rico

13　　Disabilities Law, 1 L.P.R.A. § 501 *et seq*., and the Puerto Rico Anti-Reprisal Act, 29

14　　L.P.R.A. § 194 *et seq*.  (ECF No. 1.)  Centro Médico answered the complaint, and later

15　　amended its answer with leave of the court.  (ECF Nos. 7, 16.)  Following discovery,

16　　Centro Médico moved the court for summary judgment, appending to its motion a

17　　supporting statement of material facts and numerous exhibits.  (ECF No. 40.)  Centro

18　　Médico then filed English-language translations of some of their exhibits.  (ECF No. 48.)

19　　Gabriel responded in opposition to the motion, appending to her response an opposing

20　　statement of material facts, an opposing statement of additional facts, and several

1    exhibits.  (ECF Nos. 51-53.)  Centro Médico, with leave of the court, replied to Gabriel's

2    response and statements of facts, appending to its reply two additional exhibits.  (ECF

3    No. 60.)  The court now grants the summary judgment motion because the record shows

4    that Gabriel cannot prove that Centro Médico either discriminated or retaliated against

5    her in a manner prohibited by the ADA or Puerto Rico law.  But first, the court must

6    determine the timeliness of the complaint and the administrative exhaustion of its claims.

7                                                **II.**

8                                    **Jurisdiction and Timeliness**

9          Although Gabriel and Centro Médico are citizens of the Commonwealth of Puerto

10   Rico, the court has original jurisdiction of Gabriel's claims under the ADA, a federal

11   statute.  28 U.S.C. § 1331.  Accordingly, the court also has supplemental jurisdiction of

12   Gabriel's related state-law claims.  28 U.S.C. § 1367(a).

13         "Claims of employment discrimination and retaliation under the ADA are subject

14   to the procedural requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

15   §§ 2000e-5 to -9."  *Rivera-Díaz* v. *Humana Ins. of P.R., Inc.*, 748 F.3d 387, 389 (1st Cir.

16   2014) (citing 42 U.S.C. §§ 12117[a], 12203[c]).  Under those requirements, "a would-be

17   plaintiff must first exhaust his administrative remedies."  *Id*.  "This task embodies 'two

18   key components: the timely filing of a charge with the EEOC and the receipt of a right-

19   to-sue letter from the agency.'"  *Id*. at 389-90 (quoting *Jorge* v. *Rumsfeld*, 404 F.3d 556,

20   564 [1st Cir. 2005]).  "The first component contemplates the filing of an administrative

21   charge within either 180 or 300 days of the offending conduct, depending on the

22   particular jurisdiction in which the charged conduct occurs."  *Id*. at 390 (citing *Bonilla* v.

1  *Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 278 & n. 4 [1st Cir. 1999]).  "With respect to

2  most charges of discrimination, Puerto Rico is a . . . jurisdiction in which the longer filing

3  period applies."  *Id*. (citing *Bonilla*, 194 F.3d at 278 n. 4).  "But with respect to claims of

4  retaliation" that have "nothing to do with sexual harassment[,] . . . the 180-day window

5  applies."  *Id*. (citing 42 U.S.C. § 2000e-5[e][1]).  "An unexcused failure to meet this

6  deadline forecloses recourse to the courts."  *Id*. (citing *Jorge*, 404 F.3d at 564).

7         It appears that, on or about November 18, 2013, Gabriel filed the requisite charge

8  with the EEOC.  (ECF No. 40-10 at 15-16.)  The filing was timely because Gabriel did

9  not challenge any conduct by Centro Médico that predated the filing by more than 180

10  days, the shorter of the two filing periods.  Although Gabriel first informed her employer

11  of her disability in April 2013, she did not request an accommodation until a letter dated

12  May 29, 2013.  (ECF Nos. 40-1 ¶ 37; 40-10 at 13; 52 ¶ 37.)  Neither party claims that the

13  letter was incorrectly dated.  And Gabriel does not allege any discrimination or retaliation

14  prior to that initial request for accommodation.  (ECF No. 1 ¶ 17.)  It thus appears that

15  Gabriel timely filed her EEOC charge within 180 days, not to mention 300 days, of her

16  employer's challenged conduct.

17         The second component of the ADA's procedural requirements contains another

18  deadline.  "Upon receiving a right-to-sue letter" from the EEOC, "a putative plaintiff has

19  ninety days to file suit."  *Rivera-Díaz*, 748 F.3d at 390 (citing *Loubriel* v. *Fondo del*

20  *Seguro del Estado*, 694 F.3d 139, 142 [1st Cir. 2012]).  "Failure to do so creates a

21  temporal barrier to the prosecution of an ADA claim."  *Id*. (citation omitted).

1    Gabriel asserts that she has complied with this second deadline.  (ECF No. 1 ¶ 3.)

2    Meanwhile, Centro Médico fails to address this specific procedural requirement.  Neither

3    party has filed with the court a copy of the right-to-sue letter, even though failure to meet

4    the ninety-day deadline "bars the courthouse door."  *Bonilla*, 194 F.3d at 278.  Because

5    defendant does not allege in the summary judgment motion that plaintiff failed to meet

6    this ninety-day deadline, the court deems the argument waived and finds the complaint

7    timely.  *See Gerald* v. *Univ. of P.R.*, 707 F.3d 7, 27 (1st Cir. 2013).

8    The court must now determine which claims in the timely complaint have properly

9    exhausted the EEOC's administrative remedies.

10    **III.**

11    **Exhaustion of Administrative Remedies**

12    The mere filing of a timely complaint "does not open the courthouse door to all"

13    of a plaintiff's ADA claims.  *Velazquez-Ortiz* v. *Vilsack*, 657 F.3d 64, 71 (1st Cir. 2011).

14    "Rather, the scope of the federal court complaint is constrained by the allegations made

15    in the administrative complaint: the former must 'bear some close relation' to the latter."

16    *Id.* (quoting *Jorge*, 404 F.3d at 565).  Thus, a plaintiff need not raise before the EEOC

17    every claim in the federal court complaint.  "[T]o serve the purposes of the administrative

18    exhaustion requirement – prompt notice to the agency and an opportunity for early

19    resolution – 'the factual statement in the written charge should have alerted the agency to

20    the alternative basis of discrimination' that the plaintiff raises for the first time in court."

21    *Id.* (quoting *Thornton* v. *United Parcel Serv. Inc.*, 587 F.3d 27, 32 [1st Cir. 2009])

22    (internal citation omitted).  Under the so-called "scope of the investigation" rule, new

1   allegations in a court complaint may be deemed exhausted by an earlier EEOC complaint

2   if and only if they "would have been uncovered in a reasonable investigation" of "the

3   original administrative charge," and the new allegations "still fall within the parameters

4   of [that] charge." *Thornton*, 587 F.3d at 32 (citing *Lattimore* v. *Polaroid Corp.*, 99 F.3d

5   456, 464-65 [1st Cir. 1996]).  The court will now compare Gabriel's EEOC complaint to

6   her federal court complaint in light of these principles.

7           In her EEOC complaint, Gabriel stated that she had first informed Centro Médico

8   of her disability in April 2013, almost one year after she had started to work for them as a

9   nurse.  Gabriel claimed to suffer from Marfan Syndrome, which "places [her] at risk of

10  sudden death" if she "do[es] much physical exertion."  (ECF Nos. 40-10 at 13, 51 ¶ 3.)

11  Gabriel alleged that upon giving Centro Médico "two letters requesting a reasonable

12  accommodation in which the duties . . . given to [her] are not too stressful," her employer

13  properly accommodated her by transferring her to "the Intensive area," where she "was

14  able to perform [her] duties without any problems."  (ECF Nos. 40-10 at 13, 51 ¶ 3.)

15  Gabriel further alleged that on October 21, 2013, about one and one-half months after she

16  was assigned to the Intensive Care Unit, Centro Médico transferred her to the Emergency

17  Room, "a place where there is much physical effort and more risks for an accident to

18  occur which affects [her] health," causing her to "report sick" and become hospitalized.

19  (ECF Nos. 40-10 at 13, 51 ¶ 3.)  Gabriel concluded her EEOC complaint by alleging that

20  her transfer to the Emergency Room, a more stressful environment for her than Intensive

21  Care, constituted disability-based discrimination.  (ECF Nos. 40-10 at 13, 51 ¶ 3.)

1          In the instant complaint, Gabriel's allegations cover far more ground.  She alleges,

2    for the first time, that Centro Médico not only rejected her requests for accommodation,

3    but then retaliated against her by "not allow[ing]" her "to work" and "forc[ing]" her "to

4    exhaust all her accrued leaves of absences (vacation and sick leave)."  (ECF No. 1 ¶ 17.)

5    She also alleges, for the first time, that when she returned to work, a supervisor retaliated

6    against her by treating her "justified absences" as "absenteeism" and a "disciplinary

7    problem," and by questioning her about her absences "in a hostile fashion, with a loud

8    voice . . . in front of other co-workers."  (ECF No. 1 ¶ 18.)  Gabriel declares that these

9    incidents all occurred before she "was assigned to the Intensive Care Unit."[1]  (ECF No. 1

10   ¶ 19.)  Her present allegations end where her earlier ones began – with her "assignment to

11   the Emergency Room," where the stressful environment "caused [her] to be hospitalized

12   twice (on one instance after ending her shift and in another during it) for issues with her

13   pulse and severe chest pain."  (ECF No. 1 ¶ 23.)  In a brief coda, Gabriel states that she is

14   now "assigned to the Nursery," where her responsibilities are a "better fit [for] her

15   condition."  (ECF No. 1 ¶ 24.)

16         In their summary-judgment motion, Centro Médico observes that the "only claim"

17   Gabriel made to the EEOC concerned her transfer to the Emergency Room on

18   October 21, 2013.  (ECF No. 40 at 5.)  Because Gabriel's EEOC complaint did not allege

19   any other discriminatory or retaliatory act, Centro Médico argues that the new allegations

20   in the court complaint are unexhausted.  (ECF No. 40 at 5.)  In response, Gabriel argues

---

[1] The "Intensive area" of Gabriel's EEOC complaint and the "Intensive Care Unit" of the instant complaint appear to refer to the same unit or department at Centro Médico, and are construed as such.

1  that the new allegations should be deemed exhausted because they are "reasonably

2  related to" her EEOC allegations.  (ECF No. 51 ¶ 4.)  Now, where, as here, a plaintiff

3  acted pro se before the EEOC, "the administrative charge is liberally construed in order

4  to afford [her] the benefit of any reasonable doubt."  *Lattimore*, 99 F.3d at 464 (citations

5  omitted).  "However, pro se status does not relieve a [plaintiff] of the obligation to meet

6  procedural requirements established by law."  *Id.* (citing *United States* v. *Michaud*, 925

7  F.3d 37, 41 [1st Cir. 1991]).

8        The court finds that Gabriel has failed to satisfy the administrative-exhaustion

9  requirement for the discrete discriminatory and retaliatory acts that she alleges occurred

10 before the single act raised in her EEOC complaint.  *See generally Thornton*, 587 F.3d at

11 31-33.  Indeed, the differences between her two complaints are stark.  Before the EEOC,

12 Gabriel did not file any charges related to any alleged acts of discrimination or retaliation

13 occurring before her October 21, 2013, transfer to the Emergency Room.  (*See* ECF

14 Nos. 40-10 at 13, 51 ¶ 3.)  Not only did her EEOC complaint fail to mention any earlier

15 incidents, but it did not even hint at the existence of offending conduct before her transfer

16 to the Emergency Room.  In fact, the EEOC complaint intimated that Centro Médico had

17 smoothly granted her accommodation requests: "I have taken to my employer two letters

18 requesting a reasonable accommodation in which the duties . . . given to me are not too

19 stressful, for which reason I was given accommodation for a month and a half in the

20 Intensive area, where I was able to perform my duties without any problems."  (ECF

21 Nos. 40-10 at 13, 51 ¶ 3.)  Now, in the court complaint, Gabriel claims, for the first time,

22 that Centro Médico responded to her accommodation requests with multiple acts of

1    discrimination and retaliation.  (ECF No. 1 ¶¶ 17-18).  As a result, Gabriel must rely on

2    the "scope of the investigation" rule if these new allegations are to be deemed exhausted.

3    *See Thornton*, 587 F.3d at 31.

4          The court finds that the scope of the investigation rule does not sweep so broadly

5    as to capture Gabriel's new allegations and claims.  Her EEOC charge focused solely on

6    Centro Médico's decision to transfer her from the Intensive Care Unit, where she had felt

7    accommodated, to the Emergency Room, where she did not.  (ECF Nos. 40-10 at 13, 51

8    ¶ 3.)   Using that allegation as a guide, the court sees "no reason to believe that a

9    reasonable investigation" of that charge "would have uncovered the various [earlier],

10   discrete events" that Gabriel now alleges in the court complaint.  *See Thornton*, 587 F.3d

11   at 32.  That is especially true when, as noted above, a straightforward reading of her

12   EEOC complaint indicates that these earlier events did not occur.  It is thus clear that

13   Gabriel's new allegations do not "fall within the parameters of the original administrative

14   charge."  *See Thornton*, 587 F.3d at 32 (citing *Lattimore*, 99 F.3d at 464-65).  As a result,

15   her new allegations are barred from consideration as both unexhausted and, now, time-

16   barred.

17         Gabriel attempts to salvage her unexhausted allegations by claiming that they are

18   "reasonably related to the original [EEOC] charge" and then citing, without elaboration,

19   *Clockedile* v. *New Hampshire Department of Corrections*, 245 F.3d 1 (1st Cir. 2001).

20   (ECF No. 51 ¶ 4.)  But even if the court were to assume that Gabriel's new allegations are

21   reasonably related to the solitary incident alleged in her EEOC complaint, they are still

22   unexhausted and time-barred.  After all, Gabriel's court complaint does not allege against

1    Centro Médico a single systemic violation of the ADA, but a series of discrete violations:

2    At first, her employer denied her accommodation requests, prevented her from working,

3    and forced her to exhaust her leave time (ECF No. 1 ¶ 17); next, upon her return to work,

4    a specific supervisor treated and questioned her inappropriately (ECF No. 1 ¶ 18); finally,

5    Centro Médico accommodated her by assigning her to the Intensive Care Unit (ECF

6    No. 1 ¶ 19), only to transfer her later to the Emergency Room, which she found

7    unacceptable (ECF No. 1 ¶ 20).

8            As to such "serial violations" of the ADA, "the Supreme Court has reiterated that

9    'discrete discriminatory acts are not actionable if time barred, even when they are related

10    to acts alleged in timely filed charges.'" *Thornton*, 587 F.3d at 33 (quoting *Nat'l R.R.*

11    *Passenger Corp.* v. *Morgan*, 536 U.S. 101, 113 [2002]) (applying *Morgan* to exhaustion

12    analysis);[2] *see also Ledbetter* v. *Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 639

13    (2007) ("*Morgan* is perfectly clear that when an employee alleges . . . a series of

14    actionable wrongs, a timely EEOC charge must be filed with respect to each discrete

15    alleged violation"); *Ayala* v. *Shinseki*, 780 F.3d 52, 56-57 (1st Cir. 2015) (same).  This

16    procedural limitation makes sense.  If Gabriel could pursue newly-raised claims about

17    Centro Médico's pre-October 21, 2013, conduct based on an EEOC charge about a single

18    act on that date, "such an extension of the scope of the investigation rule would

19    effectively nullify the administrative exhaustion requirement and convert it into a simple

20    notice requirement that some claim may be brought, thereby depriving employers of the

---

[2] Although the Supreme Court in *Morgan* spoke in terms of timeliness, the First Circuit in *Thornton* properly applied the reasoning in *Morgan* to the issue of administrative exhaustion.  After all, under the ADA's procedural requirements, a claim in federal court is timely if and only if it is also exhausted.  *See generally Rivera-Díaz*, 748 F.3d at 389-90; *Velazquez-Ortiz*, 657 F.3d at 70-71.

1    opportunity to resolve issues at an early stage and rendering the EEOC (and state-level

2    equivalents) superfluous."  *Thornton*, 587 F.3d at 32 (citing *Lattimore*, 99 F.3d at 464).

3    Accordingly, the court "cannot reach" Gabriel's new, unexhausted allegations.  *Id.* at 33

4    (citing *Morgan*, 536 U.S. at 114-15).

5          Gabriel's citation of *Clockedile* is inapposite.  In that case, the First Circuit Court

6    of Appeals held that Title VII retaliation claims, even if not alleged in an EEOC charge,

7    "are preserved so long as the retaliation is reasonably related to and grows out of [a]

8    discrimination complained of to the agency."  245 F.3d at 6.  The Court thereby created a

9    "narrow exception[] to the normal rule of exhaustion of administrative remedies."

10   *Franceschi* v. *United States VA*, 514 F.3d 81, 86 (1st Cir. 2008).  By its own terms, the

11   exception does not extend to discrimination claims.  *Clockedile*, 245 F.3d at 6 (the Court

12   took "no position on the proper rule for non-retaliation claims.").  Nor could it, once the

13   Supreme Court held in *Morgan*, one year after *Clockedile* was handed down, that discrete

14   discriminatory acts are not actionable once procedurally barred, even if they are related to

15   reviewable acts alleged in timely administrative charges.  *See Morgan*, 536 U.S. at 113.

16   Thus, the *Clockedile* exception does not salvage Gabriel's unexhausted discrimination

17   claims.

18         The *Clockedile* exception will not save Gabriel's unexhausted retaliation claims,

19   either.  By its own terms, the *Clockedile* exception can save a retaliation claim from

20   unexhaustion only if the claim is "reasonably related to and grows out of" an exhausted

21   discrimination claim.  *Franceschi*, 514 F.3d at 87 (quoting *Clockedile*, 245 F.3d at 6).

22   But Gabriel's only exhausted discrimination claim – her transfer to the Emergency Room

1    – arose weeks, if not months, after her unexhausted claims.  (ECF Nos. 1 ¶ 19 [alleging

2    that the unexhausted claims arose prior to Gabriel's transfer to the Intensive Care Unit],

3    40-10 at 13 [alleging that Gabriel was transferred to the Emergency Room after "a month

4    and a half" in Intensive Care], 51 ¶ 3 [same].)  And, it is implicit in the phrase "grows out

5    of" that the retaliation must occur after, not before, the exhausted discrimination claim.  It

6    does not make sense to say that an earlier incident "grows out of" a later incident – that

7    the events of Monday grow out of the events of Tuesday, or that the First World War

8    grew out of the Second World War.  *See Grow*, Webster's Third New International

9    Dictionary (1981) (defining the phrase "grow out" as meaning "result, originate").  By

10   limiting the *Clockedile* exception to retaliation claims growing out of prior discrimination

11   claims, the Court was simply targeting the exception to those cases where "by retaliating

12   against an initial administrative charge, the employer discourage[d] the employee from

13   adding a new claim of retaliation."  *Clockedile*, 245 F.3d at 5 (citing *Malhotra* v. *Cotter*

14   *& Co.*, 885 F.3d 1305, 1312 [7th Cir. 1989]).  By contrast, in cases like this one, there is

15   no need to excuse the non-filing of a second complaint because the unexhausted claims

16   arose before the filing of the original EEOC complaint.  Thus, if the alleged acts were as

17   retaliatory or even discriminatory as Gabriel now says they were, there is no reason why

18   she could not have included them in the original EEOC complaint.  Accordingly, the

19   *Clockedile* exception does not apply to her unexhausted retaliation claims.

20          In sum, the court finds that the only exhausted claims in Gabriel's federal court

21   complaint concern her transfer to the Emergency Room on October 21, 2013.

1          **IV.**

2          **Statement of Facts**

3          On April 10, 2012, plaintiff Gabriel, a recent college graduate in her early

4  twenties, applied to become a nurse with defendant Centro Médico, a hospital in Caguas,

5  Puerto Rico.  (ECF Nos. 40-1 ¶¶ 1, 7-8; 40-5 at 18; 52 ¶¶ 1, 7-8.)  In her application,

6  Gabriel stated she could work full time – and even overtime – in "rotating shifts,"

7  including on holidays and over weekends.  (ECF Nos. 40-1 ¶ 8; 40-5 at 13; 52 ¶ 8.)  On

8  May 14, 2012, Gabriel became a "pool nurse" with Centro Médico, a position that

9  required her to work twelve-hour shifts in different units of the hospital, "substituting

10  [for] other nurses [and] providing support" as needed.  (ECF Nos. 40-1 ¶¶ 9-10, 21; 52

11  ¶¶ 9-10, 21.)  Like every other pool nurse, Gabriel's shifts rotated between 7:00 a.m.-to-

12  7:00 p.m. and 7:00 p.m.-to-7:00 a.m., and she had to work fourteen such shifts every four

13  weeks.[3]  (ECF Nos. 40-1 ¶¶ 4, 10; 40-3 at 14-15; 52 ¶ 10.)  Centro Médico's rules and

14  regulations required Gabriel to work whenever and wherever she was assigned.  (ECF

15  Nos. 40-1 ¶ 5; 52 ¶ 5.)  The hospital's attendance policy mandated disciplinary action if

16  an employee missed work more than three times a month or six times a year.  (ECF

17  Nos. 40-1 ¶ 6; 52 ¶ 6.)

---

[3] Gabriel's claim that some nurses at the hospital worked eight-hour shifts and other nurses worked in assigned units does not properly controvert Centro Médico's claim that she was hired to work twelve-hour shifts as a pool nurse rotating across multiple hospital units.  (*See* ECF Nos. 40-1 ¶¶ 3-4, 10; 52 ¶¶ 3.1-4.2, 10.1-10.3.)  Moreover, Gabriel bases her claim upon a misreading of the cited record.  In the cited record, a hospital employee simply stated that pool nurses, while rotating across hospital units, will be assigned to a unit based "on the need or service," and that some "special areas like Catheterism [and] the cardiovascular laboratory" have an eight-hour shift, instead of the standard twelve-hour shift. (ECF No. 53-2 at 47-48.)

1       Upon starting her job as a pool nurse, Gabriel was informed of her job description

2   and duties, including her responsibility for "the total nursing care of patients," which

3   involves helping patients bathe, clean, dress, stand, and move in and out of beds, gurneys,

4   and wheelchairs.  (ECF Nos. 40-1 ¶¶ 22, 24-25; 52 ¶¶ 22, 24-25.)  Gabriel's job also

5   required her to stand constantly, push and pull medical carts, and move objects weighing

6   up to fifty pounds.  (ECF Nos. 40-1 ¶ 27; 52 ¶ 27.)

7       When she was about ten years old, Gabriel was diagnosed with Marfan Syndrome,

8   an inherited disorder of connective tissue that can cause cardiovascular abnormalities,

9   including progressive dilation and acute dissection of the ascending aorta, which in turn

10  can lead to sudden death by aortic aneurism.  (ECF Nos. 1 ¶ 7; 40-3 at 8; 51 ¶¶ 14, 20.)

11  Today, approximately fifteen years after her initial diagnosis, Gabriel does not suffer

12  from any cardiovascular "abnormalities" or "other structural heart diseases."  (ECF

13  Nos. 40-3 at 5; 40-8 at 15.)  According to her "treating cardiologist," Dr. Julio Jiménez-

14  Soto ("Dr. Jiménez"), Gabriel's heart, aorta, and mitral valve are all "normal."[4]  (ECF

15  Nos. 40-1 ¶ 47[a]-[c]; 40-8 at 8, 11, 15.)  Gabriel lives alone, cleans her own home,

16  drives a car without restriction, and does not collect any government disability benefits.

17  (ECF Nos. 40-1 ¶¶ 42, 44-45; 40-3 at 5-7; 40-4 at 13; 52 ¶¶ 42, 44.1, 45.)  Gabriel also

---

[4] Although the record indicates that Gabriel suffers from several health problems, the only problem that the record links to her Marfan Syndrome in a non-conclusory fashion is her scoliosis, an abnormal curvature of the spine that, Dr. Jiménez states, "produces kind of a limping movement when she moves."  (ECF No. 40-8 at 3.)  Gabriel attempts to contest her cardiologist's statement that her cardiovascular system is currently normal by pointing to his acknowledgement that her Marfan Syndrome "might" cause her cardiovascular system to "worsen" in the future, thereby placing her "at risk."  (ECF No. 52 ¶ 47[a]-[c].)  But that general acknowledgement that Gabriel may encounter future problems does not controvert Dr. Jiménez's specific diagnosis that Gabriel's present cardiovascular condition is normal. Gabriel does not cite her scoliosis as proof of disability or impediment.

1  suffers from depression, for which she takes prescribed medication, and moments of

2  tachycardia that are likely stress induced.  (ECF Nos. 40-3 at 4; 53 ¶ 4; 53-2 at 5.)

3       Between May 2012 and April 2013, Gabriel took off a total of eleven shifts in

4  combined vacation, sick, and unpaid leave.  (ECF Nos. 40-1 ¶ 12[a], [b]; 40-6 at 2-3; 52 ¶

5  12[a][1]-12[b][2].)   Then, from April 3 to 6, 2013, Gabriel did not show up to work.

6  Instead, she visited, for the first and only time, Dr. José Manatau, an internist, claiming

7  that she "didn't feel well" and was suffering from "costochondritis," an inflammation of

8  the upper chest.  (ECF No. 40-1 ¶¶ 30, 33; 40-2 at 14-15; 40-3 at 17; 40-7 at 23-24; 52

9  ¶¶ 30, 33.)  The doctor then wrote her a note, stating that Gabriel had Marfan Syndrome

10 and refractory polymyopathy, and prescribing x-rays, a lab workup, and four days of rest.

11 (ECF Nos. 40-1 ¶¶ 30-31; 40-7 at 23-24; 52 ¶¶ 30-31.)  Upon returning to work, Gabriel

12 turned the note over to Centro Médico to excuse her absence.[5]  (ECF Nos. 40-1 ¶ 30; 52

13 ¶ 30.)  She never got the x-rays or lab workup.  (ECF Nos. 40-1 ¶ 34; 52 ¶ 34.)  Centro

14 Médico ended up counting her four-day absence as paid sick leave.  (ECF Nos. 40-1 ¶ 35;

15 52 ¶ 35.)  In late April 2013, while irrigating a Heparin lock, Gabriel splashed a small

16 amount of blood into her eyes, and so she filed a workers' compensation claim with the

17 State Insurance Fund Corporation.  (ECF Nos. 40-1 ¶ 36; 48-4 at 3; 52 ¶ 36.)

18      In late May 2013, Gabriel gave Centro Médico's Nurse Manager, Amarilys

19 Rodríguez ("Rodríguez"), a written note from Dr. Jiménez, dated May 29, 2013, which

20 stated in full (aside from the greeting and closing):

_____

[5] Gabriel asserts that this doctor's note "disclosed to defendant . . . that she suffers from Marfan
syndrome and that due to it she needed a reasonable accommodation."  (ECF No. 1 ¶ 15.)  But nothing in
the record suggests that, originally, anyone viewed this note as a request for an ongoing disability-based
accommodation.  After all, the note makes no such request.  (*See* ECF No. 40-7 at 23.)

1      Mrs. Aslin Gabriel has "Marfan's Syndrome," which is an illness of the
2      connective tissues which affects the bones and joints, and it may affect the
3      blood vessels, the eye and the heart.  It may also affect the skin and the
4      lungs.  If she develops cardiac problems, it places her at risk of sudden
5      death.  Her tolerance to exercise and to physical efforts is limited.
6      "Marfan's Syndrome" does not have a cure.  Reasonable accommodation is
7      recommended in her duties.
8
9    (ECF Nos. 40-1 ¶¶ 37-38, 40; 40-7 at 27; 52 ¶ 37-38, 40.)  Dr. Jiménez had intended the

10   above description of Marfan Syndrome to indicate what "could happen" to Gabriel "if

11   she develops heart problems," but he did not intend to suggest that she has or will have

12   such problems.  (ECF No. 40-8 at 18-19.)  Dr. Jiménez had also intended the note to

13   convey that the hospital should not assign Gabriel "too much strenuous work," and by

14   "strenuous work," he meant her having "to move from one bed to another . . . a three-

15   hundred pound gentleman" because the repetition of that activity would be "like

16   weightlifting," which "could put [her] at risk."[6]  (ECF No. 40-8 at 19.)  The doctor was

17   also concerned that if Gabriel was assigned "a heavy workload," she would "feel tired"

18   and "not be in optimal condition" because of possible "joint pain."  (ECF No. 40-8 at 19-

19   20.)  But the note did not recommend a specific accommodation for Gabriel because

20   Dr. Jiménez was "not sure" about what the hospital could "provide her."  (ECF No. 40-8

21   at 20.)  The doctor was also not familiar with the duties of a hospital nurse, and he "could

22   not remember exactly what [Gabriel] was doing" at the hospital.  (ECF No. 40-8 at 21.)

_____

[6] When Gabriel heard Dr. Jiménez say that her "physical efforts" should be limited, she
understood him to mean that she "can't do things which require strength," like lift anything that weighs
more than "10 pounds."  (ECF No. 40-3 at 3-4.)  In her deposition, Gabriel used this alleged physical
limitation to claim that she suffers from a disability, and she attributed her belief in this limitation to her
cardiologist alone.  (ECF No. 40-3 at 3.)  But the record is clear that Gabriel either misunderstood or was
misrepresenting the medical advice of Dr. Jiménez because, as shown in the main text, he had deemed
Gabriel more than capable of lifting heavy weights (just not too often).

1    Rodríguez, the Nurse Manager, asked Gabriel to have Dr. Jiménez explain in detail the

2    accommodation he would recommend for her.  (ECF Nos. 40-1 ¶ 41; 52 ¶ 41.)

3         On June 5, 2013, Gabriel requested four days of paid sick leave, starting

4    immediately, to take a Holter exam.[7]  (ECF Nos. 40-1 ¶ 48; 40-4 at 12; 40-11 at 23; 52 ¶

5    48-1.)  Then, on June 18, 2013, Gabriel requested twenty-eight days of paid leave for a

6    family vacation, beginning the day before, that extended into mid-July.  (ECF Nos. 40-1

7    ¶ 50; 40-11 at 24-25; 52 ¶ 50.)

8         On June 24, 2013, during her vacation leave, Gabriel provided Centro Médico

9    with a hand-written note from Dr. Jiménez, in response to Rodríguez's request for a

10   specific accommodation recommendation, which stated in full:

11        Aslin has Marfan's Syndrome.  A regular schedule is good for her, during
12        the day, with little contact and physical effort with patients.  Shou[ld] it be
13        necessary she can do "CPR".  Her physical effort should be slight,
14        preferably 8 working hours.
15
16   (ECF Nos. 40-1 ¶ 52; 40-8 at 22; 40-9 at 1-2; 52 ¶ 52.)[8]  Dr. Jiménez had intended the

17   note to convey that Gabriel should "try to avoid . . . heavyweight workloads," such as

---

[7] Gabriel attempts to controvert this allegation by claiming that she was "forced to take a leave from work," but the only evidence she cites in support of her claim is her own deposition, where she stated that when she "was retired from work," she told her manager that she "had a trip scheduled with [her] parents," for which she was granted vacation leave.  (*See* ECF No. 52 ¶ 48.1; *see also* ECF No. 40-4 at 12-13.)  Gabriel does not controvert the sworn statement of the hospital's Director of Human Resources that Gabriel had requested sick leave for her June 2013 medical exams and was advanced vacation leave for her July 2013 trip.  (*See* ECF No. 40-5 at 4.)  Nor does Gabriel controvert the signed and dated leave-time forms in the record, which appear to show her requesting and receiving the leave time mentioned in the main text.  (*See* ECF No. 40-11 at 23-25.)  Nothing in the record substantiates Gabriel's bare assertion that the leave time she had requested and then accepted was forced on her in any way.

[8] The main text reproduces the certified translation of the letter provided at ECF No. 40-9 at 1.  It differs from Centro Médico's own translation at ECF No. 40-1 ¶ 52, which Gabriel has admitted to be true, in only two respects: Centro Médico's own translation omits the opening sentence about Gabriel having Marfan's Syndrome, and it also begins the second sentence with "It is convenient for her [to] have a regular schedule during the day . . . ."

1   having "to move heavyweight patients."   (ECF No. 40-8 at 23.)   Two days later, on

2   June 26, 2013, Rodríguez met with Gabriel to discuss the new note, at which time Gabriel

3   was reminded of her duties as a professional nurse, including having to push or pull a

4   crash cart, stand patients up, and move them in and out of beds, gurneys, and

5   wheelchairs.   (ECF Nos. 40-1 ¶ 54; 40-3 at 20-21; 40-9 at 3-4; 52 ¶ 54.)   Rodríguez told

6   Gabriel that there "weren't any eight hour shifts" available, nor were there any shifts

7   "only in the day time."   (ECF No. 40-3 at 20.)   Rodríguez reminded Gabriel that, at the

8   hospital, nursing shifts were twelve-hours long and rotated between days and nights.

9   (ECF No. 40-3 at 21.)   Citing Dr. Jiménez's medical advice, Gabriel stated that she could

10  carry a baby and push a baby carriage, and would like to "be transferred to an area like

11  maternity."   (ECF Nos. 40-1 ¶ 54; 40-9 at 4; 52 ¶ 54.)   Rodríguez told Gabriel that the

12  hospital would evaluate her request.   (ECF Nos. 40-1 ¶ 54; 40-9 at 4; 52 ¶ 54.)

13          On July 24, 2013, ten days after her vacation leave had expired, Gabriel requested

14  another four days of paid vacation leave, followed by four days of paid sick leave, then

15  followed by three days of unpaid sick leave, to excuse her continued absence from work

16  up until the next day.   (ECF No. 40-11 at 25.)   At one point, Centro Médico advised

17  Gabriel to apply for Seguro Incapacidad No Ocupacional Temporal (in English, "Non-

18  Occupational Temporary Incapacity Insurance") benefits because she did not have any

19  leave time left.   (ECF Nos. 40-1 ¶ 49; 52 ¶ 49.)   Gabriel rejected the advice because she

20  wanted "a reasonable accommodation," not "time off."   (ECF No. 53-1 ¶ 18.)   Centro

21  Médico advanced Gabriel some leave time and then granted her all of the paid vacation

22  and sick leave that she had requested.   (ECF Nos. 40-1 ¶¶ 50-51; 40-9 at 9; 52 ¶¶ 50-51.)

1        Also on July 24, 2013, Gabriel gave the hospital another hand-written note from

2    Dr. Jiménez, which stated in full: "Once again Aslin Gabriel has Marfan's Syndrome.

3    Under my medical supervision, she is authorized to work 12 hour shifts, preferably in

4    daytime." (ECF Nos. 40-1 ¶¶ 57-58; 40-9 at 7-8; 52 ¶¶ 57-58.)  Later that day, Rodríguez

5    met with Gabriel to discuss the new note, at which time Gabriel was reminded that, as a

6    pool nurse, it was her job to work in different shifts and units of the hospital depending

7    on the "needs" of each unit, and that, as a result, there was "no assurance" that the

8    hospital could assign her only to day shifts.  (ECF Nos. 40-1 ¶¶ 60-61; 40-9 at 9; 52

9    ¶¶ 60-61.)  In response, Gabriel stated that she could work both day and night shifts.

10   (ECF Nos. 40-1 ¶ 61; 40-3 at 25-26; 40-9 at 9; 52 ¶ 61.)  Gabriel was advised that if a

11   situation with her health ever arose, she should notify the hospital immediately, so that

12   the hospital could consider what arrangements to make.  (ECF Nos. 40-1 ¶ 61; 40-9 at 9;

13   52 ¶ 61.)  At the end of the meeting, a written account of the conversation was drafted by

14   hand, which both Gabriel and Rodríguez signed and dated.  (ECF No. 40-9 at 10.)[9]

15       On July 25, 2013, Gabriel returned to work and was assigned to the Intensive Care

16   Unit.  (ECF Nos. 40-1 ¶ 63; 52 ¶ 63; 53-1 ¶ 19.)  Rodríguez told Gabriel that this transfer

17   was her "accommodation".  (ECF No. 40-10 at 17.)  The Intensive Care Unit proved to

18   be a "better fit" for Gabriel in part because the unit was "peaceful" and she had, at most,

19   only two patients to care for at a time.  (ECF No. 53 ¶ 19, 53-2 at 60.)

---

[9] The account states in full: "An interview is done of Mrs. Gabriel in relation to the medical certificate of 7/24/13 wherein Dr. Jiménez authorizes for her to be able to do 12 Hr. shifts preferably in the daytime.  The employee is oriented that since she is a pool nurse, she will rotate to the areas needed and it will be evaluated according to needs; she is not assigned only A shifts because the shifts are on a rotating basis.  Employee refers that she can do P shifts.  Employee is oriented that should some health condition present itself, to notify it to evaluate what arrangements can be made." (ECF No. 40-9 at 9.)

1    On August 6, 2013, Gabriel informed a supervisor that she was going to skip her

2    7:00 a.m. shift the next day because of a 1:00 p.m. appointment at the State Insurance

3    Fund related to her April 2013 workers' compensation claim.  (ECF Nos. 40-1 ¶ 64; 40-3

4    at 27; 40-9 at 11; 52 ¶ 64.)[10]  Although Gabriel had made the appointment approximately

5    two to three months earlier, she waited until the day before the appointment to tell her

6    employer about it.  (ECF Nos. 40-1 ¶ 65; 52 ¶ 65.)   In response, Carmen Morales, a

7    higher-level supervisor, visited Gabriel at the counter of the Intensive Care Unit and

8    loudly told her that the hospital had an absenteeism problem, that her appointment would

9    not take all day, and that Gabriel would have to cover the night shift the next day, if she

10   did not show up to her day shift as scheduled.  (ECF Nos. 40-1 ¶ 66; 52 ¶ 66.)

11   On August 14, 2013, Gabriel sent a letter to the hospital's Human Resources

12   department, titled "Notification of Incident," in which she complained about Morales'

13   conversation with her on August 6th, deeming it humiliating and unprofessional.  (ECF

14   Nos. 40-1 ¶ 64; 40-9 at 11-12; 52 ¶ 64.)   In the letter, Gabriel complained that it was

15   "nobody's concern" she was going to be absent for "an appointment," that the

16   supervisor's talk with her made her "feel pressured and uncomfortable," that the

17   supervisor's "tone of voice" did not "please" her because it gave her the impression that

18   the supervisor was "annoyed and/or upset" with her, and that the supervisor had told her

19   that, if she skipped her scheduled day shift, she would have to work the night shift,

20   "knowing that in the medical recommendation for Reasonable Accommodation, they

---

[10] Gabriel does not properly controvert this allegation by pointing out that one of Centro Médico's three record citations in support of it is incorrect.  (*See* ECF No. 52 ¶ 64.)  The same is true about her attempt to controvert the allegation in the next sentence in the main text.  (*See* ECF No. 52 ¶ 65.)

1    recommend[ed] that [she not] work at night." (ECF No. 40-9 at 11-12.)  Gabriel ended

2    the letter by warning Centro Médico that she would take "pertinent legal actions" under

3    the ADA if "another incident occur[red]" which "humiliated" her and gave her "the

4    impression that [her] condition and [her] medical recommendation [were] not being taken

5    into account." (ECF No. 40-9 at 12.)  Elena Robinson, the hospital's Human Resources

6    Manager, met with Gabriel to discuss her letter, and Morales was later advised to conduct

7    her meetings with employees in private.[11] (ECF Nos. 40-1 ¶¶ 70-71; 52 ¶¶ 70-71.)

8         On August 21, 2013, Centro Médico transferred Gabriel to the Stroke Unit as part

9    of her normal rotation as a pool nurse and "due to needs in that unit." (ECF Nos. 40-1 ¶¶

10   72, 74; 52 ¶¶ 72, 74.)  Even though she knew that this transfer was part of her normal

11   rotation, Gabriel viewed it as discriminatory because she had "already settled into" the

12   Intensive Care Unit, she thought she "was going to stay [there]," and she "wasn't familiar

13   with" the Stroke Unit yet, which "concern[ed]" her. (ECF No. 53-2 at 59-60.)  But in the

14   end, although no one had suggested that her transfer to the Stroke Unit was permanent or

15   "an accommodation," Gabriel liked working in the Stroke Unit and came to view it as an

16   accommodation. (ECF Nos. 40-1 ¶ 73; 52 ¶ 73; 53-2 at 61, 76.)

17        On October 21, 2013, Centro Médico transferred Gabriel to the Emergency Room

18   "to cover service needs in [the] area because of lack of personnel." (ECF Nos. 40-1 ¶ 75;

19   52 ¶ 75.)  At the time, the Emergency Room had a staff "shortage", with six to eight

---

[11] Human Resources investigated Gabriel's complaint and interviewed all three known
eyewitnesses to the incident.  Two of the eyewitnesses, the Nurse Manager and the Head Nurse, stated
that the conversation between Morales and Gabriel had proceeded normally.  The third eyewitness, a
telemetry technician, thought that Morales' body language during the conversation was "intimidating . . .
like exercising authority." (ECF No. 48-5.)

1    nursing positions vacant.  (ECF Nos. 40-1 ¶ 76; 52 ¶ 76.)  Upon starting in that unit,

2    Gabriel went to the unit manager and "explained" her "condition".  (ECF No. 53-2 at 62.)

3    The manager telephoned Morales, but could not reach her.  (ECF No. 53-2 at 62.)  The

4    unit manager told Gabriel that she would stay in the Emergency Room until the hospital

5    could "work things out."  (ECF No. 53-2 at 62.)

6            After reporting to the Emergency Room for only three shifts – October 22, 25, and

7    26, 2013 – Gabriel stopped showing up to work entirely.  (ECF Nos. 40-1 ¶ 78; 52 ¶ 78.)

8    Either during or after two of those shifts, Gabriel had to be "treated" for "issues with her

9    pulse and severe chest pain."  (ECF Nos. 1 ¶ 23; 53-2 at 77.)  On both occasions, Gabriel

10   "felt bad," noted a "lack of control in [her] pulse," and "began to feel very weak."  (ECF

11   Nos. 40-4 at 17; 53-2 at 77.)  And so she "notified the head nurse immediately," which

12   led to an electrocardiogram that detected a "not normal" pulse.  (ECF No. 40-4 at 17.)

13   The hospital staff then gave Gabriel an IV and monitored her heartrate for a while, before

14   releasing her.[12]  (ECF No. 40-4 at 17.)  These "hospitaliz[ations]" have "caused [Gabriel]

15   severe mental damages that are yet to be resolved and for which she has needed

16   continued treatment."  (ECF No. 53 ¶ 22.)  Gabriel did not show up to work again until at

17   least November 18, 2013.  (ECF Nos. 40-1 ¶ 78; 52 ¶ 78.)

18           On November 2, 2013, Gabriel sent Morales and Robinson a letter, titled

19   "Elimination of Reasonable Accommodation," in which she complained about her

---

[12] The record does not disclose what, if anything, was in the IV.  In her deposition, Gabriel mentioned that, at some point in time, the Emergency Room also "performed a CT scan on [her] to rule out dicolitis [sic]," or inflammation of the colon, but it is unclear whether that scan occurred as part of her complaints of chest pain and an irregular heartrate.  (ECF No. 40-4 at 15.)

1   transfer to the Emergency Room, a "harmful" place that had "forced [her] to be absent,"

2   and requested a transfer back to the Stroke Unit, where she had "accomplish[ed] [her]

3   duties without placing [her] life at risk because of [her] condition of Marfan's

4   Syndrome." (ECF Nos. 40-1 ¶¶ 77-78; 40-10 at 1; 52 ¶¶ 77-78.)  In the letter, Gabriel

5   called her position in the Stroke Unit "the reasonable accom[m]odation that [she] had

6   been given because of [her] medical condition." (ECF No. 40-10 at 1.)  Gabriel warned

7   that if the hospital did not return her to the Stroke Unit, she would interpret the decision

8   as a "reprisal[] against [her] for having requested reasonable accommodation." (ECF

9   No. 40-10 at 1.)

10          On November 18, 2013, Gabriel delivered another letter to Morales and Robinson,

11   again titled "Elimination of Reasonable Accommodation," informing them that because

12   the hospital had "assigned [her] to work at the Emergency Room," thereby eliminating

13   her "reasonable accommodation without any valid justification" and "affect[ing]" her

14   health to the point that she "had to be hospitalized," she had filed an administrative

15   complaint against the hospital. (ECF Nos. 40-1 ¶¶ 78-79; 40-10 at 12; 52 ¶¶ 78-79.)

16          Hours later, Robinson and Elenia Berríos, Nurse Department Director, met with

17   Gabriel to discuss her latest letter and the administrative complaint she had filed. (ECF

18   Nos. 40-1 ¶ 80; 52 ¶ 80.1.)  At the meeting, Robinson reviewed with Gabriel the results

19   of their prior meetings and discussions, including how Dr. Jiménez had ultimately

20   authorized Gabriel "to work as usual," how Gabriel had informed the hospital "that she

21   could work day and night shifts," and how the hospital had thus placed "no restriction [on

22   her] rotating among areas." (ECF Nos. 40-1 ¶ 81; 52 ¶ 81.)  Gabriel was told that Centro

1   Médico had not granted her an accommodation because "her doctor [had] allowed her to

2   work without restrictions," but that the hospital was still "willing to evaluate alternatives"

3   if she found any particular assignment "hard for her."  (ECF Nos. 40-1 ¶ 81; 52 ¶ 81.)

4        On November 22, 2013, the Director of Centro Médico's Nursery Unit met with

5   Gabriel to inform her that she had been assigned to the unit and would be working "days

6   and nights" there.  (ECF Nos. 40-1 ¶ 82; 52 ¶ 82.)  Upon learning of her new duties,

7   Gabriel was pleased with the transfer.  (ECF Nos. 40-1 ¶ 82; 52 ¶ 82.)  On November 25,

8   2013, Gabriel started as a nurse in the Nursery Unit and has been working there ever

9   since – a permanent position she is happy with.[13]  (ECF Nos. 40-1 ¶¶ 84, 87-88; 52 ¶¶ 84,

10  87-88.)  Gabriel continues to work as a full-time nurse at Centro Médico, where she has

11  been receiving all the usual "incentives and salary increases" and has not suffered any

12  reduction in benefits.  (ECF Nos. 40-1 ¶ 88; 52 ¶ 88.)

13       On January 31, 2014, Gabriel visited Dr. Jiménez, so that he could evaluate her

14  condition in light of the episodes of "chest pain, low blood pressure and tachycardia" that

15  she had experienced during her Emergency Room shifts three months earlier.  (ECF

16  No. 40-8 at 6.)  Dr. Jiménez concluded that Gabriel should stop taking some medications

17  that "another physician," perhaps "her primary physician," had prescribed for her

18  tachycardia because those medications were "too strong" for her and were causing her

19  "some side effects," including "lower[ing] too much her blood pressure" and "mak[ing]

20  her prone to another type of arrhythmia."  (ECF No. 40-8 at 7-8.)

---

[13] Gabriel attempts to controvert Centro Médico's statement that she is happy working in the
Nursery Unit by claiming that the record does not support that statement, but Centro Médico was citing
Gabriel's own deposition testimony, in which she stated that she is, indeed, happy there.  (ECF No. 40-1 ¶
87) (citing ECF No. 40-4 at 16, lines 21-22.)

1      # V.

2      ## Summary-Judgment Standard

3      "Under Federal Rule of Civil Procedure 56(a), 'the court shall grant summary

4      judgment if the movant shows that there is no genuine dispute as to any material fact and

5      the movant is entitled to judgment as a matter of law.'" *Ins. Co. of Pa.* v. *Great Northern*

6      *Ins. Co.*, 787 F.3d 632, 635 (1st Cir. 2015) (quoting Fed. R. Civ. P. 56[a]). "A genuine

7      dispute is one that a reasonable fact-finder could resolve in favor of either party and a

8      material fact is one that could affect the outcome of the case." *Flood* v. *Bank of Am.*

9      *Corp.*, 780 F.3d 1, 7 (1st Cir. 2015) (citing *Gerald*, 707 F.3d at 16). "As to issues on

10     which the summary judgment target bears the ultimate burden of proof, she cannot rely

11     on an absence of competent evidence, but must affirmatively point to specific facts that

12     demonstrate the existence of an authentic dispute." *Kenney* v. *Floyd*, 700 F.3d 604, 608

13     (1st Cir. 2012) (quoting *McCarthy* v. *Nw. Airlines, Inc.*, 56 F.3d 313, 315 [1st Cir.

14     1995]). When reviewing a summary-judgment motion, the court "assess[es] the record in

15     the light most favorable to the nonmovant and resolv[es] all reasonable inferences in that

16     party's favor." *Ameen* v. *Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir.

17     2015) (quoting *Barclays Bank PLC* v. *Poynter*, 710 F.3d 16, 19 [1st Cir. 2013]). "But,

18     ultimately, 'even in employment discrimination cases where elusive concepts such as

19     motive or intent are at issue, summary judgment is appropriate if the non-moving party

20     rests merely upon conclusory allegations, improbable inferences, and unsupported

21     speculation.'" *Ray* v. *Ropes & Gray LLP*, 799 F.3d 99, 116-17 (1st Cir. 2015) (quoting

22     *Benoit* v. *Tech. Mfg. Corp.*, 331 F.3d 166, 173 [1st Cir. 2003]).

1                                            **VI.**

2                              **Summary-Judgment Analysis**

3          In the court complaint, Gabriel properly alleges two claims under the ADA against

4   Centro Médico: that, on October 21, 2013, the hospital both discriminated and retaliated

5   against her by transferring her from the Intensive Care Unit, where she states that her

6   alleged disability was accommodated, to the Emergency Room, where she states that it

7   was not.  (ECF No. 1 ¶¶ 20-21.)  Gabriel also alleges a couple of Puerto Rico law claims

8   against her employer.  For the following reasons, the court finds that Centro Médico is

9   entitled to judgment as a matter of law on each claim.[14]

10  **A.      Discrimination Claim**

11         Under 42 U.S.C. § 12112(a), "[a] plaintiff seeking to establish a prima facie case

12  of disability discrimination under the ADA must show, by a preponderance of the

13  evidence, '(1) that she was 'disabled' within the meaning of the ADA; (2) that she was

14  able to perform the essential functions of her job with or without accommodation; and (3)

15  that she was discharged or adversely affected, in whole or in part, because of her

16  disability.'"  *Jones* v. *Walgreen Co.*, 679 F.3d 9, 14 (1st Cir. 2012) (quoting *Ruiz Rivera*

17  v. *Pfizer Pharms., LLC*, 521 F.3d 76, 82 [1st Cir. 2008]).  The failure of an employer to

18  reasonably accommodate the known disability of an employee constitutes an adverse

---

[14] In her EEOC complaint, Gabriel alleged only that her transfer to the Emergency Room constituted discrimination.  It is thus arguable that her present claim that the transfer also constituted retaliation is unexhausted.  But the court does not have to enter this controversy because Gabriel's newly-alleged retaliation claim is easily resolved on the merits.  *See Morales-Cruz* v. *Univ. of P.R.*, 676 F.3d 220, 223-24 (1st Cir. 2012).

1   action under the third element of the above test.  *EEOC* v. *Kohl's Dep't Stores, Inc.*, 774

2   F.3d 127, 131 (1st Cir. 2014); *see also* 42 U.S.C. § 12112(b)(5)(A).

3       The court finds that Gabriel has failed to show that she could prove that she is

4   disabled within the meaning of the ADA.  Under the ADA, the term "disability" includes

5   "a physical or mental impairment that substantially limits one or more major life

6   activities of [an] individual," such as "the operation of a major bodily function." 42

7   U.S.C. § 12102(1)(A), (2)(B).  Here, Gabriel's claim of being disabled rests on the fact

8   that she "suffers from Marfan syndrome," which, she alleges, is "an impairment that

9   substantially limits the operation of the major bodily functions of the connective tissues

10  and circulation to a point in which there is a threat of sudden death."  (ECF No. 51 ¶¶ 14,

11  23.)  But Marfan Syndrome is not a per se disability.  A court may not deem a plaintiff

12  disabled based "on his diagnoses alone," but must, instead, "'on a case-by-case basis' . . .

13  assess the effect of [his] alleged impairment on his life . . . to determine whether he is

14  disabled within the meaning of the ADA."  *Carreras* v. *Sajo*, 596 F.3d 25, 33 (1st Cir.

15  2010) (quoting *Albertson's, Inc.* v. *Kirkingburg*, 527 U.S. 555. 566 [1999]); *see also*

16  *Ramos-Echevarría* v. *Pichis, Inc.*, 659 F.3d 182, 187-88 (1st Cir. 2011).  The only effects

17  or impairments that Gabriel mentions in her opposition to the summary-judgment motion

18  are a need to avoid heavy lifting and a need to avoid episodes of stress-induced

19  tachycardia.  (ECF No. 51 ¶ 22.)  Those effects are insufficient to show that Gabriel's

20  Marfan Syndrome rises to the level of a disability.

21      Gabriel cites Dr. Jiménez's deposition for the proposition that she "needs to avoid

22  strenuous work, meaning heav[y] lifting."  (ECF No. 51 ¶ 22.)  But, as was noted above,

1    by "strenuous work," the doctor meant "something like weightlifting," such as having "to

2    move from one bed to another bed a three-hundred pound gentleman."  (ECF No. 40-8 at

3    19.)  Even then, the doctor's recommendation was that Gabriel should not do "too much

4    strenuous work," indicating that she may do such work intermittently.  (ECF No. 40-8 at

5    19.)  In *McDonough* v. *Donahoe*, 673 F.3d 41 (1st Cir. 2012), the First Circuit held that

6    the inability to lift more than "ten pounds continuously and twenty pounds intermittently"

7    does not constitute a substantial limitation on a major life activity.  *Id*. at 48.  After all,

8    the Court noted, "if a restriction on heavy lifting were considered a substantial limitation

9    on a major life activity, then the ranks of the disabled would swell to include infants, the

10   elderly, the weak, and the out-of-shape."  *Id*. (quoting *Gillen* v. *Fallon Ambulance Serv.*,

11   283 F.3d 11, 22 [1st Cir. 2002]).  Accordingly, the limitation on Gabriel's ability to do

12   heavy lifting does not constitute a disability under the ADA.

13          Gabriel's need to avoid stress-induced tachycardia does not render her disabled,

14   either.  The record contains only two instances in which Gabriel experienced tachycardia,

15   and both episodes occurred during her first and only week of working in the Emergency

16   Room.[15]  (*See* ECF Nos. 40-1 ¶ 78; 40-4 at 17; 52 ¶ 78; 53-2 at 77.)  The record is silent

17   as to what caused the episodes, except for Dr. Jiménez's general diagnosis that Gabriel's

---

[15] Tachycardia is defined as "relatively rapid heart action whether physiological (as after exercise) or pathological."  Webster's Third New International Dictionary 2326 (1981).  Gabriel's own description of her condition is hardly more illuminating.  She claims that when she suffers from tachycardia, her pulse either lacks or loses control, "increas[ing] and . . . lower[ing] momentarily," making her "feel very weak."  (ECF Nos. 40-4 at 17; 53-2 at 77.)  She also claims that "severe chest pain" can accompany her tachycardia.  (ECF Nos. 1 ¶ 23.)  Neither claim establishes that her tachycardia constitutes a disability.  Although Gabriel asserts that the episodes of tachycardia in the record led to her hospitalization, her own deposition makes plain that this is simply her colorful way of describing how her complaints to hospital staff about her pulse and feelings of weakness led the staff to monitor her heartrate and give her fluids via an IV before letting her go home.  (*See* ECF Nos. 40-4 at 17; 53-2 at 77.)

1  tachycardia is "likely related to stress."  (ECF No. 53-2 at 5.)  But Gabriel claims to feel

2  stress whenever she is "going to go to work," and the record shows that she went to work

3  for almost one year before taking any sick leave attributed to her Marfan Syndrome, and

4  for almost one and one-half years before experiencing tachycardia at work.  (ECF

5  Nos. 40-1 ¶¶ 30-31; 40-3 at 22; 52 ¶¶ 30-31; 53 ¶ 22.)  Moreover, the fact that Gabriel

6  had two episodes of tachycardia after eighteen months on the job cannot be blamed on

7  worsening health because the only evidence in the record about the general health of her

8  heart is the statement of her own cardiologist that Gabriel's cardiovascular system was

9  "normal" during this period, free of any "abnormalities" or "structural heart diseases."

10  (ECF Nos. 40-1 ¶ 47[a]-[c]; 40-3 at 5; 40-8 at 11, 15.)  Accordingly, when viewed in the

11  light most favorable to Gabriel, the record shows that stress causes her to experience

12  tachycardia "only episodically," as opposed to "at all times," and that her stress-induced

13  tachycardia is thus not a disability under the ADA.  *See Wright* v. *CompUSA, Inc.*, 352

14  F.3d 472, 476 (1st Cir. 2003) (quoting *Calef* v. *Gillette Co.*, 322 F.3d 75, 86 [1st Cir.

15  2003]).

16        In any event, nothing in the record connects Gabriel's tachycardia to her Marfan

17  Syndrome.  If anything, the record suggests that Gabriel's susceptibility to tachycardia

18  during the week she worked in the Emergency Room was due to a negative drug reaction.

19  When Gabriel's cardiologist evaluated her after the incidents in the Emergency Room, he

20  concluded that she should stop taking some medications that another physician had

21  prescribed for her tachycardia because those medications were "too strong" for her and

22  were causing "some side effects," including "lower[ing] too much her blood pressure"

1   and "mak[ing] her prone to another type of arrhythmia," which is precisely what Gabriel

2   appears to have suffered while working the Emergency Room – an irregular heartrate.

3   (ECF No. 40-8 at 7-8.)  By definition, if Gabriel's tachycardia is unrelated to her Marfan

4   Syndrome, it cannot be used to establish that her Syndrome is, in fact, a disability.  *See*

5   42 U.S.C. § 12102(1)(A) (the alleged disability must itself "substantially limit[]" a major

6   life activity of the claimant).  Thus, the record fails to show that the impairments Gabriel

7   suffers due to her Marfan Syndrome rise to the level of a disability under the ADA.[16]

8        Next, the court assumes, without deciding, that Gabriel is able to perform the

9   essential functions of her job with or without accommodation, including working 12-hour

10  rotating shifts and lifting items weighing up to fifty pounds.  After all, under the third and

11  final note from her cardiologist, Gabriel was approved "to work 12 hour shifts, preferably

12  in daytime."  (ECF Nos. 40-1 ¶¶ 57-58; 40-9 at 7-8; 52 ¶¶ 57-58.)  And, when discussing

13  that note with the hospital, Gabriel declared that she could actually work both day and

14  night shifts.  (ECF Nos. 40-1 ¶ 61; 40-3 at 25-26; 40-9 at 9; 52 ¶ 61.)  Even if Gabriel

15  still had to operate under the restriction, from her cardiologist's second note, of "little

16  contact and physical effort with patients," the record is clear that Dr. Jiménez had simply

17  meant that she should "try to avoid . . . heavyweight workloads," such as having "to

18  move heavyweight patients."  (ECF Nos. 40-1 ¶ 52; 40-8 at 22-23; 40-9 at 1-2; 52 ¶ 52.)

19  And, as noted above, the doctor's specific restriction was that Gabriel should not "move

20  from one bed to another bed a three-hundred pound gentleman" too often.  (ECF No. 40-

---

[16] To be clear, the court finds that, viewed together, all the impediments that Gabriel cites to prove that her Marfan Syndrome constitutes a disability under the ADA are insufficient to the task.

1   8 at 19.)  It is thus clear that Dr. Jiménez had deemed Gabriel physically able to perform

2   the essential functions of her job.  (*See* ECF No. 40 at 15-17 [setting forth the hospital's

3   understanding of the essential functions of a nurse]).  Ironically, it is only Gabriel's gross

4   misunderstanding of Dr. Jiménez's advice that led her to believe that she may not lift

5   anything that weighs more than "10 pounds."  (ECF No. 40-3 at 3-4.)

6           Finally, the court finds that Centro Médico did not fail to reasonably accommodate

7   a known disability of Gabriel's by transferring her to the Emergency Room.   "The

8   obligation is on the employee to provide sufficient information to put the employer on

9   notice of the need for accommodation."  *Jones* v. *Nationwide Life Ins. Co.*, 696 F.3d 78,

10  89 (1st Cir. 2012) (citing B. Lindemann & P. Grossman, Employment Discrimination

11  Law ch. 5.III, at 269 [4th ed. 2007]).   The employee "must explicitly request an

12  accommodation," and the "request must be sufficiently direct and specific, and it must

13  explain how the accommodation is linked to [the employee's] disability."   *Id*. (citing

14  *Freadman* v. *Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 102 [1st Cir. 2007]).

15          The court finds that Gabriel did not communicate to Centro Médico a request that

16  was sufficiently direct and specific as to put her employer on notice of her alleged need

17  for a particular accommodation that precluded her transfer to the Emergency Room.

18  When Dr. Jiménez wrote in his final note to the hospital that Gabriel could work a

19  standard 12-hour shift, and when Gabriel then told the hospital that she could also work

20  night shifts, Centro Médico no longer had a pending request to accommodate because

21  Gabriel and her cardiologist had effectively signed off on her working the standard

22  rotation of a pool nurse.  In fact, Gabriel admits that, when she met with Rodríguez to

1   discuss her final doctor's note, she not only declared that she could work the standard 12-

2   hour rotating shifts, but she was expressly informed – without recorded objection – that

3   she would continue to "rotate" across "different shifts and areas, depending on those

4   areas['] needs," and was expressly advised that if, in the future, she experienced "any

5   health situation," she should "immediately notify the hospital," so that the hospital could

6   "evaluate what measures could be taken."  (ECF Nos. 40-1 ¶¶ 60-61; 40-9 at 9; 52 ¶¶ 60-

7   61.)   Gabriel may now complain that her transfer to the Emergency Room was

8   "contraindicated due to her condition," but she has never identified a single nursing task

9   that her alleged disability made painful, difficult, or dangerous, nor has she detailed how

10  her self-described limitations on physical effort precluded her from working the

11  Emergency Room, but not the Stroke Unit or the Intensive Care Unit.  (ECF No. 51

12  ¶ 108.)   Accordingly, Gabriel cannot fault Centro Médico for failing to grant her an

13  accommodation that she neither specified, nor clearly requested.

14       Gabriel responds to this problem by claiming that Dr. Jiménez's final note to the

15  hospital "did not rule out [his] previous [accommodation] recommendations."  (ECF

16  No. 52 ¶ 58.1.)  But it was hardly obvious at the time (or even now) that Dr. Jiménez did

17  not intend his July 24th note to supersede his earlier notes or that he still stood behind his

18  request of one month earlier that Gabriel have "little contact and physical effort with

19  patients."[17]  (ECF Nos. 40-1 ¶ 52; 40-8 at 22; 40-9 at 1-2; 52 ¶ 52.)  In any event, that

---

[17] Gabriel states that, aside from the references she made to her doctor's accommodation requests in two letters she wrote to the hospital, the only requests that were ever made on her behalf were contained in her doctor's notes.  (*See* ECF Nos. 40-1 ¶ 62; 52 ¶ 62.1.)  And, once Gabriel and her cardiologist had affirmed her ability to work a normal shift, the only direct request for accommodation that can be gleaned from Gabriel's doctor's notes is the one quoted in the main text.

1    request was quite vague in the context of Gabriel's nursing position, a central aspect of

2    which is her responsibility for "the total nursing care of patients," including "constant

3    contact and attention to [them]."  (ECF Nos. 40-1 ¶¶ 24-25; 52 ¶¶ 24-25.)  Moreover, the

4    record shows that the request's lack of specificity was actually purposeful because

5    Dr. Jiménez "could not remember exactly what [Gabriel] was doing" at the hospital and

6    was "not sure" about what the hospital could "provide her."  (ECF No. 40-8 at 20-21.)

7        Gabriel then muddled whatever specificity the recommendation may have had

8    when she met with Rodríguez to discuss it.  Gabriel claimed that Dr. Jiménez had told her

9    that "when she has a baby[,] she may carry it and use the carriage," which then led her to

10   request "if it is possible that she be transferred to an area like maternity."  (ECF Nos. 40-

11   1 ¶ 54; 40-9 at 4; 52 ¶ 54.)  But Gabriel's reading of the note implied (1) that she could

12   have plenty of contact with some patients (namely, babies), which directly contradicted

13   the categorical statement in the note, and (2) that she was incapable of caring for patients

14   who required more physical effort, which, as noted above, was a gross misrepresentation

15   of Dr. Jiménez's actual finding.  Accordingly, the hospital was hardly on notice about the

16   precise accommodation being requested in the penultimate doctor's note.

17       By accepting Centro Médico's July 24, 2013, solution to her doctor's notes and

18   then failing to mention her alleged need for further accommodation until early November

19   2013, only a couple of weeks before she filed her administrative charge, Gabriel did not

20   adequately cooperate in the interactive process that the hospital had initiated. In response,

21   Gabriel claims that she was not completely silent throughout the months of August,

22   September, and October 2013, pointing to her August 8, 2013, letter to the hospital as an

1   instance in which she had "requested reasonable accommodation" during that period.

2   (*See* ECF No. 52 ¶ 62.1.)  But that letter simply mentioned, as part of Gabriel's complaint

3   that her supervisor had told her to work the night shift if she was going to skip her entire

4   day shift to go to an afternoon appointment, that her doctor had recommended that she

5   not "work at night."  (ECF No. 40-9 at 12.)  That passing mention was a nullity because

6   Gabriel had already told Centro Médico that the recommended accommodation was

7   entirely unnecessary.  (ECF Nos. 40-1 ¶ 61; 40-3 at 25-26; 40-9 at 9; 52 ¶ 61.)  Gabriel's

8   failure to tell her employer that she did not fully accept their July 24, 2013, solution

9   compounds her earlier failure to directly and specifically articulate the accommodations

10  she was requesting.  And, insofar as she had articulated that her Marfan Syndrome

11  necessitated her transfer to "an area like maternity" (*see* ECF No. 40-8 at 4), that request

12  was patently unreasonable "in light of the specific facts of the case," including Gabriel's

13  gross misrepresentation to the hospital about what Dr. Jiménez had cleared her to do.  *See*

14  *Calero-Cerezo* v. *United States DOJ*, 355 F.3d 6, 23 (1st Cir. 2004).  Where, as here, "an

15  employer engages in an interactive process with the employee, in good faith, for the

16  purpose of discussing alternative reasonable accommodations, but the employee fails to

17  cooperate in the process, then the employer cannot be held liable under the ADA for a

18  failure to provide reasonable accommodations."  *Kohl's Dep't Stores*, 774 F.3d at 132.

19        Even though the claim would be procedurally barred as unexhausted, Gabriel also

20  cannot complain about the weeks that elapsed between her November 2, 2013, request for

21  accommodation and her transfer, later that month, to the Nursery Unit.  (*See* ECF

22  Nos. 40-1 ¶ 82; 40-10 at 1; 52 ¶ 82.)  After all, the hospital had routinely engaged Gabriel

1  in a meaningful dialogue about her accommodation requests, and the record indicates that

2  if Gabriel had not missed work from late October 2013 until November 18, 2013, the

3  hospital would have met with her earlier and could have perhaps transferred her earlier.

4  (ECF Nos. 40-1 ¶¶ 40-41; 40-5 at 5; 40-9 at 3-4, 9; 40-10 at 17-18; 52 ¶¶ 40-41.)  Under

5  these circumstances, Centro Médico cannot be held responsible for the delay in the

6  commencement of the interactive process that led to Gabriel's current assignment in the

7  Nursery Unit.  *See Enica* v. *Principi*, 544 F.3d 328, 339 (1st Cir. 2008).  Accordingly, the

8  court finds no basis in the record to conclude that Centro Médico ever denied Gabriel a

9  requested accommodation that was reasonable.

10         In sum, in responding to Centro Médico's motion for summary judgment, Gabriel

11  has failed to point the court to anything in the record that might substantiate her claim

12  that Centro Médico discriminated against her in violation of the ADA.         *See*

13  L.Cv.R. 56(c), (e) (D.P.R. 2009).  In any event, the court finds that there is no basis in the

14  record to support Gabriel's claim.

15  **B.    Retaliation Claim**

16         "To make out a prima facie retaliation claim, the plaintiff must show that: '(1) she

17  engaged in protected conduct; (2) she experienced an adverse employment action; and

18  (3) there was a causal connection between the protected conduct and the adverse

19  employment action.'"  *Kelley v. Corr. Med. Servs.*, 707 F.3d 108, 115 (1st Cir. 2013)

20  (quoting *Calero-Cerezo v. U.S. DOJ*, 355 F.3d 6, 25 [1st Cir. 2004]).

21         On several occasions, albeit with varying levels of directness and specificity,

22  Gabriel requested that Centro Médico accommodate her alleged disability.  "'Requesting

1    an accommodation is protected conduct for purposes of the ADA's retaliation provision,'

2    as, of course, is complaining of discrimination on the basis of disability." *Valle-Arce* v.

3    *P.R. Ports Auth.*, 651 F.3d 190, 198 (1st Cir. 2011) (quoting *Freadman*, 484 F.3d at 106).

4    Moreover, "[a] plaintiff's retaliation claim may succeed even where her disability claim

5    fails." *Id.* (citing *Freadman*, 484 F.3d at 106).  Accordingly, the record establishes that

6    Gabriel engaged in protected conduct.

7         In the complaint, Gabriel alleges multiple instances of adverse employment action.

8    First, she claims that "[u]pon requesting a reasonable accommodation she was not

9    allowed to work and was forced to exhaust all her accrued leaves of absences (vacation

10   and sick leave)."  (ECF No. 1 ¶ 17.)  Next, she claims she was "denied" reasonable

11   accommodation.  (ECF No. 1 ¶¶ 17-18.)  Finally, she claims that her "assignment to the

12   Emergency Room was . . . retaliatory."  (ECF No. 1 ¶ 21.)  But an employment action

13   will not be found adverse simply because a plaintiff says it was.  Rather, "[t]o establish

14   an adverse employment action, [Gabriel] must show that 'a reasonable employee would

15   have found the challenged action materially adverse, which in this context means it well

16   might have dissuaded a reasonable worker from making or supporting a charge of

17   discrimination.'"  *Colón-Fontánez* v. *Municipality of San Juan*, 660 F.3d 17, 37 (1st Cir.

18   2011) (quoting *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 [2006])

19   (internal quotations omitted).

20        At the outset, even if the claim were not procedurally barred as unexhausted, the

21   court would decline to countenance Gabriel's bare assertion that, upon making her

22   accommodation requests, Centro Médico did not allow her to work and "forced" her to

1    go on leave for an undisclosed period of time.  (ECF No. 1 ¶ 17.)  Gabriel does not reveal

2    who allegedly forced her to take this leave or even when the allegedly forced leave

3    occurred.  In addition, Gabriel points to nothing in the record that supports her assertion,

4    and the assertion actually contradicts some of her subsequent claims.  For example, in her

5    opposition to the summary-judgment motion, Gabriel claims that her "proposed

6    accommodation" was "medical leave," that "[l]eave was granted to [her]," and that all of

7    her leave had "been duly documented with medical certificates and approved and

8    authorized by [Centro Médico]."  (ECF No. 51 ¶¶ 96, 99, 101.)  Thus, the catchy claim

9    that Centro Médico barred her from work appears to be another instance of Gabriel's

10   tendency to use exaggerated terminology when recounting the underlying facts, such as

11   when she told the hospital that her transfer to the Emergency Room had "forced [her] to

12   be absent" from work, by which she appears to have meant that she had decided to take

13   some approved sick leave.[18]  (ECF Nos. 40-10 at 1; 52 ¶ 78.1.)  Indeed, the record

14   contains leave-time applications, which Gabriel signed and dated, indicating that she

15   expressly requested all of her leave time and that the hospital did not force it upon her.

16   (ECF Nos. 40-6 at 4-14; 40-10 at 9-11; 40-11 at 23-25.)

17         The court fails to see how any denial by Centro Médico of Gabriel's requests for

18   accommodation can be construed as retaliation when, as found above, her requests were

---

[18] Gabriel told the hospital that she sought "medical assistance" during her sick leave, but the record does not support her assertion.  (ECF No. 40-10 at 1.)  Instead, the record shows that Gabriel waited approximately three months to visit her cardiologist, at which time he indicated that her Emergency-Room incidents may have been caused by improperly-prescribed drugs.  (ECF No. 40-8 at 6-8.)

1    not sufficiently direct and specific, were not reasonable, and were not warranted.  Instead,

2    any denial of her requests was fully justified under the record before the court.

3         The court also finds that the record fails to support the claim that Gabriel's transfer

4    to the Emergency Room was retaliatory.  Gabriel claims the transfer was "contraindicated

5    due to her condition," but does not support the claim with a record citation, nor does she

6    explain how anyone could have intuited that she would react so negatively to the

7    Emergency Room after having reacted so positively to the Stroke Unit and the Intensive

8    Care Unit.  (*See* ECF No. 51 ¶ 108.)  Moreover, Gabriel agrees that she "was assigned to

9    the Emergency Room to cover service needs in said area because of lack of personnel."

10   (ECF Nos. 40-1 ¶ 75; 52 ¶ 75.)   By admitting that this "legitimate, non-retaliatory

11   explanation" for her transfer to the Emergency Room was the actual reason behind her

12   transfer, Gabriel effectively concedes that the hospital's decision was not "motivated by a

13   retaliatory animus."   *See D.B.* v. *Esposito*, 675 F.3d 26, 41 (1st Cir. 2012) (citing

14   *Carreras* v. *Sajo, García & Partners*, 596 F.3d 25, 36 [1st Cir. 2010]).

15        In sum, in responding to Centro Médico's motion for summary judgment, Gabriel

16   has failed to point the court to anything in the record that might substantiate her claim

17   that Centro Médico retaliated against her in violation of the ADA.  *See* L.Cv.R. 56(c), (e).

18   In any event, the court finds that there is no basis in the record to support Gabriel's claim.

19   **C.    <u>Puerto Rico Law Claims</u>:**

20        In the summary-judgment motion, Centro Médico argues that they also warrant

21   judgment as a matter of law on Gabriel's claims under the Puerto Rico Disabilities Law,

22   1 L.P.R.A. § 501 **et seq.**, and the Puerto Rico Anti-Reprisal Act, 29 L.P.R.A. § 194 *et*

1   *seq.* (ECF No. 40 at 31-32.)  Gabriel did not oppose this aspect of the motion, *see* ECF

2   No. 51, and thus has "fail[ed] to assert a legal reason why summary judgment should not

3   be granted" on these claims.  *Merrimon* v. *Unum Life Ins. Co. of Am.*, 758 F.3d 46, 58

4   (1st Cir. 2014) (quoting *Grenier* v. *Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 [1st Cir.

5   1995]).   Accordingly, Gabriel has waived all opposition to the entry of summary

6   judgment on her local-law claims.  *Id.*

7          In any event, the court finds merit in Centro Médico's arguments.  As to Gabriel's

8   claims under the Puerto Rico Disabilities Law, also known as Law 44 of July 2, 1985,

9   Centro Médico contends that because the "definition of disabilities under Law no. 44 . . .

10  mirrors the ADA's definition of disability," summary judgment must be entered against

11  her "inasmuch as she has failed to present sufficient evidence to establish a prima facie

12  case of discrimination."  (ECF No. 40 at 31.)  The legal basis of that argument appears

13  sound.  For example, the Puerto Rico statute provides that covered businesses "shall be

14  bound to carry out reasonable accommodations in the workplace in order to ensure that

15  qualified disabled persons will be allowed to work effectively and to the maximum of

16  their productivity, except when the employer is able to prove that such reasonable

17  accommodations would represent an extremely onerous burden" for the business.

18  1 L.P.R.A. § 507a.  That statute appears to track the elements of the ADA under 42

19  U.S.C. §§ 12112(a) and (b)(5).  Moreover, the Puerto Rico Supreme Court has held that

20  Law 44 was drafted to "conform to [the] ADA."  *Rivera Flores* v. *Cia ABC*, 138 D.P.R. 1

21  (1995).  The First Circuit, in turn, has called Law 44 "Puerto Rico's version of the ADA."

22  *Lebrón* v. *Puerto Rico*, 770 F.3d 25, 33 (1st Cir. 2014).  Accordingly, the court sees no

1  reason to doubt that Centro Médico merits summary judgment on Gabriel's Law 44 claim

2  because they also merit such judgment on her claims under the ADA.

3        As to Gabriel's claims under the Puerto Rico Anti-Reprisal Act, also known as Act

4  115 of December 20, 1991, Centro Médico argues that the law "only prohibit[s]

5  retaliation because an employee has filed a complaint before any Agency or had testified

6  before any administrative or judicial forum," and that the law does not extend to acts of

7  retaliation in response to an internal request for a disability-based accommodation.  (ECF

8  No. 40 at 31-32.)  The language of the statute does, indeed, limit its cause of action to

9  retaliations against an employee's conduct "before a legislative, administrative or judicial

10 forum in Puerto Rico."  29 L.P.R.A § 194a(a).  Accordingly, the court agrees with Centro

11 Médico that it deserves summary judgment on this claim because Gabriel "has pointed to

12 no retaliatory act after she filed her charge before the . . . EEOC."  (ECF No. 40 at 32.)

13 Insofar as she has pointed to such an act, the court finds nothing in the record to support

14 the allegation that it constituted retaliation.

15                                          **VII.**

16                                     **<u>Conclusion</u>**

17        The court hereby **GRANTS** defendant's motion for summary judgment in full.

18 (ECF No. 40.)  In reaching this disposition, the court has repeatedly enforced Local Rule

19 56, an "anti-ferret rule . . . intended to reduce the burden on trial courts and 'prevent

20 parties from unfairly shifting the burdens of litigation to the court.'"  *Advanced Flexible*

21 *Circuits, Inc.* v. *GE Sensing & Insp. Techs. GmbH*, 781 F.3d 510, 520 (1st Cir. 2015)

22 (quoting *Cabán Hernández* v. *Philip Morris USA, Inc.*, 486 F.3d 1, 8 [1st Cir. 2007]).

1   But the burdens of litigation can be shifted to the court in more ways than one.  When a

2   party routinely mischaracterizes the record or is unclear about the nature or basis of her

3   claims, the court must often bear the onus of clearing a path through those obfuscations

4   and confusions.  Here, the court had to spend hours upon hours trying to decipher not

5   only the record basis of the plaintiff's claims, but also what those claims are.  A party

6   does not strengthen her case by seeking to bend every negative event into a claim,

7   especially when the claims begin to contradict one another.

8          Based on the record before the court, Centro Médico merits summary judgment on

9   the entire complaint.  Indeed, by allowing Gabriel to work full time in the Nursery Unit,

10  Centro Médico appears to have granted her an accommodation she does not deserve.  But

11  the court is well aware that the record before it was limited.  Medical records were not

12  submitted.  Depositions were heavily excerpted.  Documents were not fully explained.

13  Moreover, the symptoms of Gabriel's Marfan Syndrome might one day worsen, or more

14  proof about her current condition might be obtained.  But unless a plaintiff is able to

15  muster sufficient evidence in the record to defeat an otherwise adequate summary-

16  judgment motion, the motion must be granted.

17          **IT IS SO ORDERED.**

18          San Juan, Puerto Rico, this 20th day of November, 2015.

19                                             S/José Antonio Fusté
20                                             JOSE ANTONIO FUSTE
21                                             U. S. DISTRICT JUDGE